ATTORNEY AUSTIN J. McGUIGAN, For the Mohegan Tribe Indians
ATTORNEY DALE T. WHITE, General counsel for the Mohegan Tribe
ATTORNEY SARAH STEERE, Assistant State's Attorney
ATTORNEY'S BEEBE CARR, Representing the Defendant
MONITORED AND TRANSCRIBED BY: MALISSA D. PRESTON
THE COURT: Now, all right, this is State versus Donald Brodeur. I have most of the record — I have all of the briefs and memorandums that have been filed going back to last year or last year and a half, I don't know how long. Actually, some of them were in existence before I even got involved in this, so some went back to last fall — in the summer or the summer before. And I have the most recent — I have everyone's brief for this plus the reply brief, which was the best part of the whole deal; how each other characterized what the other had said.
And also defense argument to me that I have to go beyond the shorthand test and be rational. I'm the rational judge that threw out the whole drunk driving statute, don't you remember that?
(All laughing)
THE COURT: The Supreme Court didn't think I was so rational. Okay. Your motion, you go first.
MS. CARR: Yes, Your Honor. Good morning, Your Honor. First of all I would like to thank you for your indulgence over the past year of letting us take out time and work through each issue as it arose. We appreciate CT Page 15941-y your time and your obvious patience.
THE MONITOR: State your name please.
MS. CARR: Susan Carr from Beebe and O'Neil. We've gone over several arguments many times, Your Honor, I'm going to try to summarize some of the main points and then address some of the points that both the amicus curiae and the state has raised in its brief — in the several briefs.
In short, the state is asking you to apply a federal case from California and other states cases from the Midwest and to ignore Connecticut general statute section 53-24 and Connecticut case law to determine that the —
THE COURT: What exactly is 53A-24, [53a-24], and what is its significance?
MS. CARR: It determines whether an offense is criminal in nature or not.
THE COURT: Are you sure that's what it says?
MS. CARR: It defines an offense.
THE COURT: Okay.
MS. CARR: Offense being criminal. And under State versus Trahan the Appellate Courts in the state of Connecticut applied 53A-24, [53a-24], to Connecticut general statute section 14-227A, [14-227a], and determined that it was not criminal in nature, but that it was a regulation.
So, both the state and the Mashantucket — sorry. The Mohegan Indians are asking that you ignore 52A-24, [52a-24], and State versusTrahan and the cases that lye beneath State versus Trahan to determine that despite those things 14-227A, [14-227a], is criminal in nature, that's what they are saying, and that it can be enforced on the reservation.
However, State versus Trahan is clear and I think this case is bound by the Appellate Court decision —
THE COURT: Brown, Trahan, Klutz, et cetera, et cetera, et cetera, et cetera. CT Page 15941-z
MS. CARR: Brown, Trahan, Klutz and its progeny to determine that14-227A, [14-227a], is actually civil or regulatory in nature and therefore cannot be enforced on the Mohegan reservation.
THE COURT: Okay. And the intent of 53A-24, [53a-24], is to make clear if something is not an offense, therefore criminal or whatever, they don't lose their voting rights, right?
MS. CARR: Right.
THE COURT: That's what it's all about, that's why we're here, because somebody tried to get cute. Okay.
MS. CARR: Nevertheless, the Appellate Court of this state has determined that 14-227A, [14-227a], is civil or regulatory under a 53 — 53-24 analysis. Therefore, under Cabazon (Phonetic) — the Cabazon case and under Mashantucket versus McGuigan —
THE COURT: McGuigan.
MS. CARR: — 14-227A, [14-227a], cannot be enforced on the reservation, because it is a motor vehicle violation. The tribe has its own motor vehicle —
THE COURT: It's a motor vehicle violation.
MS. CARR: The tribe has its own motor vehicle violations and enforces them themselves; and there was testimony that they did enforce them themselves. Some of the case law that has come up or some of the other —
THE COURT: Let me ask you something. Okay. Other than Trahan, Brown, Klutz, et cetera —
MS. CARR: Yes.
THE COURT: — and 53A-24, [53a-24], in what other way is operating under the influence like a motor vehicle violation as compared to every other crime offense that there is. Mandatory minimums, prison sentences, probation, everything, everything about it.
MS. CARR: On those cases —
THE COURT: Okay. How other than that decision is it not; any other CT Page 15941-aa reason other than those decisions, that's what I want to know.
MS. CARR: Well, it depends on the penalty, Your Honor. Some penalties under DUI just make you go through a program. On this particular offense, Mr. Brodeur —
THE COURT: That's in your brief.
MS. CARR: — maybe subject to nothing more than a fine and community service.
THE COURT: He could also get a mandatory prison sentence. More so, people —
MS. CARR: He could.
THE COURT: — routinely go to jail for OUI for a longer period of time than drug offenses, weapons offenses, everything. But, okay.
MS. CARR: And I think some of the cases that the state presents from the Midwest do and run it and say, okay, how much time is he looking at, what is the penalty to this particular offense and run it. If there is mandatory jail time such as a second offender then they'll say, okay, it's criminal in nature. I think some of the Midwestern cases from how I read do and run them like that and kind of bootstrap them into a criminal offense.
However, we're looking at Connecticut. We don't have any Connecticut case law to say it is criminal in nature. The Connecticut cases that the state has presented all have to do with violation of probation. And some of the cases they presented to state that 14-227A, [14-227a], is criminal in nature have to do with a DUI causing a violation of probation.
A probation person — a person on probation showing up 15 minutes late to a probation check-in can be violated for probation. It doesn't mean 15 minutes — being 15 minutes late is criminal it's the violation of probation that's criminal not the 15 minutes. Similarly in cases that they point to —
THE COURT: Yeah, violation of probation for the purpose of the Interstate Detainer (Sic) Act is not an offense. Okay.
MS. CARR: Well, what I'm saying is the cases that they point out say, here is a DUI statute that violated probation. The case mentions CT Page 15941-ab criminal, therefore DUI must be criminal in nature. But, that's not true. The underlying offense, a violation of probation may be criminal in nature, but the offense that — the thing that — the act that triggered the offense, the violation, isn't necessarily criminal.
What I'm saying is a 15-minute delay in showing up for a probation check-in can violate your probation. There are cases that we read on it — we can't seem to find it, but there is one that came down recently saying, 15 minutes late for probation check-in can violate your probation. Being 15 minutes late is not a crime, but the violation itself is the crime.
So, the state cases that they present saying, look, DUI equals violation of probation equals criminal does not apply. This Court is bound, I believe, by State versus Trahan by the determination of the Appellate Court. Now, they said you have to apply State versus Cabazon. That would —
THE COURT: No, no, no, not State versus Cabazon.
MS. CARR: The cabazon test.
THE COURT: Now, you've gone into the federal venue now.
MS. CARR: Right. The cabazon test, because this happened on a reservation. But, that would result in — a result that wouldn't make any sense. For example, I'm driving —
THE COURT: Well, why am I applying the state test?
MS. CARR: Because, this is a state court, Your Honor. And it's the state trying to prosecute my client.
THE COURT: It's interesting whether or not somebody should move for a removal on this whole matter in the first place under the U.S. code.
MS. CARR: The state is prosecuting Mr. Brodeur not the federal courts.
THE COURT: Okay.
MS. CARR: And we're in a state court we're bound by state law. And this state is unique; the cases they present from the Midwest indicate that under state law — under their own state law the matter is criminal. They may apply the cabazon test. However, they say under CT Page 15941-ac Minnesota state law, under Idaho state law. Our DUI statute —
THE COURT: This will get me — evidentially, those states understand what a crime is, I don't know about Connecticut.
MS. CARR: Our DUI statute is criminal in nature. They may apply the cabazon test, but if you apply the cabazon test what result do we have? of f the reservation a DUI is non-criminal in nature under State versusTrahan, on the reservation the DUI is criminal under State versusBrodeur? That doesn't make any sense. It has a result that makes no sense under the case law of this state.
The state also points to other cases which cite 18-U.S.C.-1662, [18 U.S.C. § 1662], as a basis to say that they keep saying that this statute — the statute we're dealing with is 25-U.S.C.-1662, [25 U.S.C. § 1662], which the Settlement Act where the federal government gives power to the state to take on the criminal jurisdiction on the reservation.
THE COURT: Okay. I misunderstood you for a second. Okay.
MS. CARR: Okay. So, 25-U.S.C.-1662, [25 U.S.C. § 1662], is the statute we're dealing with. The state —
THE COURT: That's a federal statute.
MS. CARR: Yes. But, it conveys power to the state.
THE COURT: Not a state statute. Okay.
MS. CARR: It's my understanding —
THE COURT: But, it conveys the power.
MS. CARR: Right. If congress doesn't give the power to the state, the state can't take it and that's what we have here. The title when the act was in — excuse me one minute. (Pause) The title of 25-U.S.C.-1662, [25 U.S.C. § 1662], when it was in congress there was a section seven and the title read, assumption by state of jurisdiction over crimes and motor vehicle traffic. It was then passed by congress, changed by congress —
THE COURT: Right. CT Page 15941-ad
MS. CARR: — and the end result is 25-U.S.C. — oh, I'm sorry, it's 1775D, which reads —
THE COURT: And you point this out in your brief they left out some of the motor vehicle language or whatever.
MS. CARR: Consent of the United States of the state to state assumption of criminal jurisdiction —
THE COURT: Does that change the legislative history?
MS. CARR: Well, the legislative history —
THE COURT: Not really.
MS. CARR: — takes out and motor vehicle traffic. Therefore they are not conveying that power to the state. The state can't take it.
THE COURT: But, all part of the legislative history is the public safety, public highways and everything like that. But, your point is right, they did take it out, but in the legislative history that's what they were talking about —
MS. CARR: However —
THE COURT: — what their purpose was. Okay.
MS. CARR: But, the only mention of public safety throughout all of the documents that were viewed —
THE COURT: Is in the gaming section; that's in the gaming section.
MS. CARR: — It says that the state police can come to the gaming facilities, and the act defines gaming facilities as rooms in which class three games go on. In other words, the gambling rooms themselves, not the street surrounding the casino, not anything else within the walls of the gaming rooms themselves.
In its brief the state confuses the sections that are omitted and they don't talk about the title as I presented it in my brief and I just wanted to point that out. I've read the section in the states brief and I was confused when I read it, so it does talk about — it does talk about — CT Page 15941-ae
THE COURT: They left it out.
MS. CARR: — traffic —
THE COURT: Do you have anything —
MS. CARR: — signs —
THE COURT: — in your history of why they left it out?
MS. CARR: No, Your Honor, I don't.
THE COURT: All right. Does it change anything about what they said before hand what they were attempting to do about public safety, roads, and everything? Even though they took it out and they didn't — I agree they don't have it anywhere else in the actual writing other than section seven about gaming rooms and all that.
MS. CARR: But, I think the fact that —
THE COURT: It doesn't change the history though, does it?
MS. CARR: But, the fact that they took it out is important; it's part of the history, why would they take it out?
THE COURT: It's a point. It's a point.
MS. CARR: Because, they don't want to confer that power.
THE COURT: again, you were grabbed on to a point, which I cannot explain why they did it. But, I do know the history is what they were attempting to do was public safety including highways. But, okay, you have a point.
MS. CARR: but, we can certainly draw the inference that they took it out, because they didn't want to confer that power, that's clear.
THE COURT: okay.
MS. CARR: if I give you the power of one, two, three, I take three back it's because I don't want you to have it.
THE COURT: okay. CT Page 15941-af
MS. CARR: okay.
THE COURT: so, you want me to make an inference?
MS. CARR: Yes.
THE COURT: Okay.
MS. CARR: Okay.
THE COURT: So, you want me to make an inference?
MS. CARR: Yes.
THE COURT: Okay.
MS. CARR: Also, the state makes several points under 18-U.S.C.-1662, [18 U.S.C. § 1662], which deals with some of the similar Settlement Acts of the cases in the Midwest. However, 18-U.S.C.-1662, [18 U.S.C. § 1662], conveys criminal and civil jurisdiction; our statute does not, it only conveys criminal jurisdiction and retains civil jurisdiction to the Mohegan Tribe.
Also, the case law under 18-U.S.C.-1662, [18 U.S.C. § 1662], indicates under State versus Major that the statutes associated with Settlement Acts need to be read narrowly in order to allow as much sovereignty to the Indian tribes as possible. So, I don't think we can broaden 25-U.S.C.-1662, [25 U.S.C. § 1662], and say, well, it's kind of in the line we'll just let it happen. I think that it has to be read narrowly under federal case law — or under — I think it's a state — sorry, it's an Idaho case.
Now, the Mohegan's have filed an amicus brief and a reply brief.
THE COURT: Your interpretations of their brief was beautiful in your reply brief. Everything they said you said — you interpreted what they said; you didn't say much about the states brief in your reply brief, but boy, you really talk a lot about their reply brief.
MS. CARR: Well, the timing of — well in their amicus brief they —
THE COURT: I had to be jumping back and forth from what you say and CT Page 15941-ag they said to say what they said (Sic) and decide what really was said.
MS. CARR: Well, the important thing, Your Honor, the amicus brief attaches an exhibit, and the exhibit was written by parties unknown.
THE COURT: My guess it's an attorney general opinion, that's my guess, but I could be wrong. It wasn't made clear anywhere.
MS. CARR: I think it was on — my reading of it was done for the Mohegan's by someone employed by the Mohegan's. However, if you read it carefully they are actually arguing that the state does not have jurisdiction over motor vehicle matters and some of the language indicates that they want to retain that power to themselves, which is why I believe they have their own motor vehicle ordinance.
In the memo it states that in order to determine whether something is criminal or prohibitory or civil or regulatory, and therefore unenforceable, you must look at state law. State law here is clear. Stateversus Trahan says that it is not criminal and prohibitory it is civil and regulatory. It also discusses and recognizes the gaps that may fall between state criminal statutes and the Mohegan ordinances or their enforcement of things that may not fall within the state criminal ordinances and they just don't — they had the opportunity before when they did this memo and recognized those gaps to fix those gaps and they didn't do it.
And also, curiously, is inconsistent with what they state in their amicus brief. So, in the exhibit it pays go to state law to determine whether something is criminal or civil and in their brief they say, no, no, no, look at federal law to determine whether something is civil or criminal. Here we have to look at state law. The state is the one prosecuting —
THE COURT: You mean criminal or prohibitive or regulatory?
MS. CARR: Criminal, prohibitory or civil and regulatory and we've been through it many times civil regulatory is not enforceable on the Mohegan reservation.
I want to address a couple of the newer cases that were mentioned in the state's brief, most recent brief.
THE COURT: Nevada? CT Page 15941-ah
MS. CARR: Nevada.
THE COURT: I don't think Nevada stands for what they claim it stands.
MS. CARR: I don't think so either, Your Honor. In Nevada they say, Nevada states ordinarily it is now clear —
THE COURT: I didn't buy Nevada, so don't waste your time.
MS. CARR: Okay.
THE COURT: Nevada to me was a more of a civil context and whatnot. Unless you want to.
MS. CARR: No, that's okay, Your Honor.
THE COURT: I got Nevada right here somewhere. Nevada versus Hicks
(Phonetic). A real headache case.
MS. CARR: They also mention a case Hull versus State of Florida to attack our claim that Mohegan Sun Boulevard is not a public highway of this state. And in Hull versus State it seems irrelevant to the case at hand. And in Hull the acts occurred on federal land on a reservation and the Court stated that under the agreement covered by that reservation the Court acknowledges that the United States authorized the states to exercise jurisdiction by legislative enactment over civil and criminal offenses committed by or against Indians or other persons within the reservation.
What's important in the case is the statute is very different than the one we deal with here. First of all, we're not operating under public law 280 as Hull versus State of Florida is and there is no indication that the vehicular homicide statute, which —
THE COURT: Wait, wait, wait. You're not operating under 280?
MS. CARR: Well —
THE COURT: Completely you're saying 280 has no relevance at all?
MS. CARR: It's my understanding that we're under the Settlement Act. Now, where public law 280 comes in there — CT Page 15941-ai
THE COURT: What about their argument that the Settlement Act is miles (Sic) completely after 280?
MS. CARR: But, it's not identical, Your Honor.
THE COURT: Okay. But, it's not even — is it similar, is it very similar? You won't even say it's very similar; you won't say it's similar at all. Okay. All right.
MS. CARR: Well, it's also my understanding that public law 280 confers civil and criminal jurisdiction and the act that we're under does not.
THE COURT: All right.
MS. CARR: It just confers criminal jurisdiction not civil. If it conferred both we wouldn't be here, Your Honor. There's also no indication that the vehicular homicide statute addressed in Hull versusThe State of Florida is the language is very different from our 14-227A, [14-227a]. 227A indicates on a public roadway of this state. The statute used in Hull versus The State of Florida states, a person shall not attempt to operate or be in actual physical control of any vehicle on a highway.
THE COURT: I can't remember — it's in one of the briefs they replied to your argument there; would that make it New Jersey or Pennsylvania or something like that, which somebody did that, I remember that.
MS. CARR: Your Honor, the statutes speak for themselves. It says on a highway of this state. Now, they've also gone to State versus Harrison
and attacked our position that Mohegan Sun Boulevard is not a highway of this state. The Court looked at various — in State versusHarrison, the Court looked at various indeceos (Sic) of public highway when they looked at the highway in State versus Harrison.
However, we're not saying that the state has to plow every road to have a jurisdiction over it. Rather that is evidence of whether or not a state — a roadway is public. There has been testimony and stipulations that Mohegan Sun Boulevard is maintained entirely by the Mohegan Tribe. They fix the potholes, they plow the roads, they sand the roads, they take care of it. The state doesn't have anything to do with it and there is no municipality that has anything to do with the maintenance of the road. CT Page 15941-aj
There is also testimony that the Indians are allowed to oust people. If I go into a casino, I cause a problem they can throw me off the reservation and keep me off the reservation outside of the boundaries including Mohegan Sun Boulevard as long as they want. If I drive on the Mohegan Sun Boulevard the tribal police can stop and tell me to leave. That's been the testimony and Mr. White testified to that. They can enforce an ousting. The tribal police can enforce an ousting.
In Lawfter (Phonetic) versus Bridgeport, the case stands for the fact if every person does not have the equal right to walk or drive on that property it is not public. And Lawfter versus Bridgeport says, quote, if a car of the Defendant has in that street any right superior to the right of the humblest person who has occasion to travel on it then it is not a highway. A highway is a public way open and free to anyone who has occasion to pass along it on foot or with any kind of vehicle; and that'sLawfter versus Bridgeport at 68 Conn. 475.
Therefore, if the humblest person, if I can use the Court's language, can get ousted from the reservation outside of the limits of Mohegan Sun Boulevard that roadway is not a public roadway of this state.
Lastly, the Mohegan's Amicus brief on one hand admits it's not a public highway —
THE COURT: On that one I didn't buy the Mohegan's at all. They say one thing then they say another, I'm not buying them.
MS. CARR: They say it's not a public highway then they say it is, because they don't want to be the ones to enforce 14-227A, [14-227a] —
THE COURT: They are also trying to protect —
MS. CARR: — or their version.
THE COURT: — their overall interest in trying to say two things at once. Okay.
MS. CARR: One moment, Your Honor. (Pause) That's all I have for now, Your Honor.
THE COURT: Thank you. You did — CT Page 15941-ak
MS. CARR: I'll save comments for rebuttal.
THE COURT: — your briefs, the points that you were able to find, the arguments, you did an excellent job for yourself and your client.
MS. CARR: Thank you.
THE COURT: You made something — a major problem out of being able to use the law to your — to at least attempt to your benefit. Okay.
MS. CARR: Thank you, Your Honor.
THE COURT: Who wants to go first? The state, okay.
MS. STEERE: Thank you, Your Honor. Good morning.
THE COURT: Before you start I got a question for you. It's going to be — I'll put it to you, too. When they did the Settlement Act and they did the compacts and the agreements and everything else and the conduct by the state of Connecticut, did or did they not intend that the state of Connecticut have jurisdiction over OUI, but for Trahan, Brown, et cetera?
MS. STEERE: Yes, Your Honor.
THE COURT: They thought they had covered it.
MS. STEERE: There is no doubt that they intended to cover that, yes, Your Honor.
THE COURT: Does the tribe want to answer that question, too? Mr. McGuigan.
MR. MCGUIGAN: Yes, Your Honor, there is no question that the tribe intended that the drunk driving statute would apply.
THE COURT: Okay. Now, is the intent of the agreements — nobody would argue contract law here, because I don't know why, I'll come back to that later. But, that was clearly intent. But, there is Brown, there is Trahan, there is the missing section of the Settlement Act.
MR. MCGUIGAN: Yes, Your Honor. CT Page 15941-al
THE COURT: Okay. The State can go on.
MS. STEERE: Actually, Your Honor, since you brought that up I would like to clarify that what you call the missing section of the Settlement Act. If you look at the language that was omitted, Your Honor, that doesn't refer to traffic offenses. What that refers to is the jurisdiction of the State Traffic Commission. That was —
THE COURT: Right.
MS. STEERE: That section was pulled out and —
THE COURT: As I said before I don't think it changes the history and everything else that's in there.
MS. STEERE: No, I just wanted to note for the Court, Your Honor, that the legislative history after that section after it's been pulled out goes on to say that the reason why it was pulled out was because congress, the tribe and the state did not need congressional approval to have this act to effectuate state traffic jurisdiction on the Mohegan reservation.
Quote unquote, although the section provides congressional consent to the state assumption of traffic control jurisdiction, it's different from traffic offenses on the Mohegan reservation. Congressional consent is not necessary to make this arrangement operative.
In other words, they said to the state and the tribe, you can handle it yourselves. Which, Your Honor, is exactly what they did, then they went on to the compact in which the federal government said to the tribe and the state and to all tribes and states, you can work out civil and criminal jurisdiction arrangements between the state and the individual tribe.
THE COURT: And they tried to, right.
MS. STEERE: And they did.
THE COURT: They tried to even including OUI. That was their intent.
MS. STEERE: Well, no, we're looking at the traffic standards and they took that section about the traffic standards, State Traffic Commission, and put that right in the compact; very similar language, Your Honor. CT Page 15941-am We're dealing with traffic control.
THE COURT: Right.
MS. STEERE: And I think that's where the Defendant is confused. It's not traffic. Your Honor, there is no doubt that Connecticut law applies on the reservation, through the Settlement Act, through the compact, and if the Settlement Act through the final Settlement Act didn't apply on the reservation then the state would have jurisdiction anyway over theNon-Indian versus Non-Indians in exception on the McBradney (Phonetic) trilogy.
THE COURT: Wait, wait, wait, wait. There is no doubt that Connecticut law — that's a general generic statement.
MS. STEERE: Your Honor, I'll rephrase that.
THE COURT: Connecticut law —
MS. STEERE: The 14-227 —
THE COURT: — has jurisdiction over what the Indian tribe gave them under the acts and the agreements.
MS. STEERE: Right. Your Honor, and you're right. That was —
THE COURT: Only what they gave them.
MS. STEERE: Let me specify that. You're absolutely right. Good point that it's actually — we'll go to specific, the specific law in question, which is section 14-227A, [14-227a].
THE COURT: Okay.
MS. STEERE: There is no doubt that Connecticut 14-227A, [14-227a], applies on the reservation; that jurisdiction is either through the Settlement Act, it's either through the compact, combination of the both —
THE COURT: Why?
MS. STEERE: Well —
THE COURT: Did they agree to it, is it the agreement or are you saying CT Page 15941-an it's the agreement as well as analysis, Cabazon analysis and all that other stuff or did they agree to that, I'm asking you that, did they agree to it?
MS. STEERE: They agreed to it.
THE COURT: Okay.
MS. STEERE: And we're backed up by the law in every footing, Your Honor, with federal law, we're backed up with state law and we're backed up with the individual agreements with the tribe all the way through the facts and the law are on the side of the state. And if for some reason, Your Honor, you found that the Settlement Act didn't apply and the compact didn't apply then the state would have jurisdiction under theNon-Indian versus Non-Indian exception under the McBradney (Phonetic) trilogy of cases.
And, Your Honor, there is no doubt that the Connecticut OUI applies on the reservation. The cases cited by the Defendant, Trahan, Klutz, Brown, Gluckeon (Phonetic) do not say that for purposes of criminal jurisdiction that operating under the influence is not a crime. In fact, Your Honor, these cases stand for just the opposite. They show that Connecticut's classification scheme for offenses, crimes and violations does not preclude a statute from being considered a criminal offense. And this is key: the test using Gluckeon —
THE COURT: Wait a second.
MS. STEERE: I'm sorry, should I keep going?
THE COURT: (Pause) Okay, go ahead.
MS. STEERE: The test using Gluckeon in appellate using 27 Conn. App. 225, and I'm citing page 234, 1992. The Court doesn't follow the ridged application over penal codes definitional statutes, and instead consider them in the context of the matter at hand along with the functions and the purposes of the laws at issue.
In no case does the Defendant cites that for the purposes of criminal jurisdiction for 14-227A, [14-227a], or for the purposes of enforcing14-227A, [14-227a], that this section may not be considered a crime. In fact, Your Honor, if you look at our own Supreme Court in State versusDukes, the Court says, operating under suspension is not a minor traffic violation, there is a fine and imprisonment and therefore it's a crime, CT Page 15941-ao it's a misdemeanor. In fact, this is for a big liberty (Sic) interest in this case. They said that the police may pat down a Defendant after stopping them for operating under suspension and handle themselves as if it was a circumstances of a custodial arrest.
THE COURT: Well, the U.S. Supreme Court has gone way beyond that, but that's beside that.
MS. STEERE: It's not logical for the Supreme Court in Connecticut to say, operating under suspension is a crime with far less penalties and ramifications for the Defendant and to say that operating under the influence is simply a minor traffic violation.
Furthermore, Your Honor, these cases don't even define motor vehicle violations and the Court has held that the criminal procedure rules apply in operating under the influence cases.
Moving on, Your Honor, to whether a state law applies on an Indian reservation. This is a federal question. I believe the state law actually enforces the state's argument, but the test here that needs to be applied is a federal question. And the reason this is, is because if you simply took a state's classification of a law, states all over this nation could classify any law they wanted as criminal and if they had a public law 280 or Settlement Act type of jurisdiction grant they could simply enforce that law on the reservation. They could overstep sovereignty, they could squash sovereignty down and they could say, our law is criminal and therefore it's going to apply on the reservation because our legislature said it's criminal.
That's why we have this special test, Your Honor, it's important. That's why the Court has to scrutinize exactly what that law does. Is it criminal? Does it prohibit behavior? The criminal prohibitory test. They have a shorthand test to see if it violates state public policy and this is used in state courts around this nation and in both federal district circuit courts and the United States Supreme Court.
This analysis is used for any type of law. It's used for traffic offenses, it's used for fireworks violation, it's used for gaming. There's a whole plethora of case law on this. It's used for every type of law. Its analysis is critical to protect the sovereignty of the Indian tribes.
Furthermore, Your Honor, the Defendant says that the operating under the influence law of the state of Connecticut is regulatory. We don't CT Page 15941-ap have one case that says that OUI law is regulatory. In fact, Your Honor, if you look at how our law is structured, the point one standing was enacted to get the intoxilizers (Phonetic) as a scientific test admitted into evidence. You have to look at the evolution of our law, their claiming point one, which means regulate drunk driving.
THE COURT: No, there's common law, there is the one point. And every judge that has charged a jury on that knows that.
MS. STEERE: Per se section is another way to prosecute the case where the legislature said, not only can you have behavioral, but you can have per se. This statute, Your Honor, does not set levels of intoxication. We have case law that says, but it doesn't set levels of intoxication. I think the Defendant is confused we don't prohibit driving after consumption.
THE COURT: I don't buy that argument at all.
MS. STEERE: Okay.
THE COURT: The regulatory argument on that at all.
MS. STEERE: Moving on to whether the Mohegan Sun Boulevard is a public highway. Your Honor, by agreement between the state of Connecticut and the Mohegan tribe this road is a public highway. In the compact the tribe agreed to be bound by State Traffic Commission —
THE COURT: State traffic rights, nothing else.
MS. STEERE: Right. But, looking at that the State Traffic Commission said, okay, to the Mohegan's —
THE COURT: All of that was warrant to construction, the lanes, and all that. Nowhere is there any indication that they were agreeing to the actual policing of the traffic.
MS. STEERE: But, we're not going into that with this argument, Your Honor. What we're simply saying is whether this is a public highway, whether this is open to the public. The State Traffic Commission said, all right to the Mohegan tribe. If you're going to have large volumes of traffic and you want an interchange you need to agree to maintain this as a public highway.
However, that would be defining public — however, that is CT Page 15941-aq defining Connecticut law. If Connecticut says you can't have anybody — you can't kick anybody off the road then the Mohegan's won't be able to do that. If they said that you can, if case law comes out and says that they can then they can do that.
But, as Connecticut law is, whatever that's determined to be public highway, the Mohegan's agreed to that. They didn't have to agree to that, they didn't have to sign that document on condition 42, they could have gone back to the drawing board and negotiated, but they didn't.
And in practice, Your Honor, this road is open 24-hours a day, seven days a week, there are no tollbooths. Twenty-five thousand people a day at the time of the incident were using this road. How can this road be called anything other than a public highway? The casino wants people to come, they are encouraging business, they advertise, they've got restaurants, they've got retail stores, they've got special events. If nobody came —
THE COURT: Whose public highway?
MS. STEERE: What?
THE COURT: Whose public highway?
MS. STEERE: The Mohegan Sun Boulevard.
THE COURT: The state of Connecticut's public highway?
MS. STEERE: No, I'm saying the Mohegan Sun Boulevard. They want people to come on the reservation and that's the main road to get to the public high — to get to the casino, is the Mohegan Sun Boulevard. It's the access road.
THE COURT: Okay. But, isn't all your other arguments and all your other sections that because the case law, the federal law and every other law, the sovereignty and everything has to go toward the sovereignty of the tribe unless it's explicitly stated?
MS. STEERE: Your Honor —
THE COURT: Almost all your cases state that.
MS. STEERE: Your Honor, the tribe specifically agreed to open this up through the compact. The Indian gaming regulatory act knew that there —
CT Page 15941-ar
THE COURT: To open it up, but did they agree to make it a public highway?
MS. STEERE: Well, they agreed to abide by the State Traffic Commissions regulations and the State Traffic Commission before they gave them —
THE COURT: And it's a definite distinction traffic —
MS. STEERE: Right.
THE COURT: In what was written and what was written and what we're talking about here.
MS. STEERE: But, Your Honor, what's critical to know here is that the tribe in the state set forth what they were going to do in terms of the states obligations and the tribes obligations in the compact. The tribe said, we're going to abide by what the traffic commissioner recommends, they said that, we're going to abide by it, they signed a compact, it's a federal document, it's approved by the Secretary of Interior. And they said we're going to maintain section — condition 42, this road, as a public highway. Why? You heard from the Department of Transportation engineer.
The safety factor of not having that road open to the public for people coming off the highway into an exit where they couldn't go anywhere would be horrendous. And that's why they had to agree to maintain that road as a public highway.
Now, if they weren't going to do that, it there wasn't going to be an interchange maybe this would be a different story today, but it's not. They agreed to keep it open, because they wanted the tribe and the state to work together to facilitate the growth of the casino. The state's doing this for the patrons (Sic) for state citizens, for tribal members, for citizens from other states. So, to call this anything other than a public highway just isn't the case.
Now, Your Honor, if the tribe wants to change its mind, if they want to say tomorrow that they don't want to have anybody on the reservation anymore for whatever reason they decided not to have gaming, they could simply go to federal court and say, we want to amend the compact, or they could go to the — they could even avoid court probably and go to the state and say, look, we want to amend the compact, they can amend CT Page 15941-as it, go to the Secretary of Interior, get it published and they've amended the compact, they've changed it, no more public highways the state would have to do something —
THE COURT: They got to get into an agreement with the state.
MS. STEERE: They have to get into agreement with the state. The state and the tribe would have to get together —
THE COURT: Which is my first question to the tribe when they get up.
MS. STEERE: Pursuant to the Indian gaming regulatory act the two parties have to get together. The federal government didn't want to get involved in all the minutia here. They said to the state and to the tribe, here is a statute that says to you two, you can go ahead and work out your agreements and that's what the state and the tribe did and again, if the tribe wanted to change its mind they can amend the compact.
Now, Your Honor, what happens if the state or the tribe doesn't want to abide by that agreement? What if they don't follow the rules and amend the compact? Well, if either side breached, Your Honor, if the tribe says, we're going to shut down this road, the state says, we're not going to have an interchange —
THE COURT: How come these kinds of arguments aren't really in your briefs? Now, you're giving me the common sense, the real thought process behind these laws. You didn't do it in your brief, now you tell me why these laws are the way they are. Okay, great.
MS. STEERE: Well, Your Honor, on that, either side — if either side breached this agreement the other side can take them right into federal district court, because, again, the federal government knew that there might be some problems.
THE COURT: And I don't think anybody is going to question — that's the only place they could go.
MS. STEERE: It would go to federal district court and the Court would decide which party was at fault and come up with the appropriate remedy.
THE COURT: And in fact, wouldn't you agree if I was interpreting just this agreement he wouldn't even have standing, if that's all that I was doing. Whether or not there was a grant of OUI. CT Page 15941-at
MS. STEERE: There's an argument that —
THE COURT: The only reason we're here is —
MS. STEERE: — certainly can be —
THE COURT: — because this is a criminal, state prosecution for an OUI. Okay.
MS. STEERE: And also, Your Honor, finally in practicality it's a safety issue off of route two there would be thousands of cars backed up there daily and it would be terribly unsafe and it's simply open to the public, there's no question about that. Another question the Defendant seems to not quite understand is that the public highway she says on behalf of the Defendant, Attorney Carr claims it a public highway can't exits — it can't coexist on an Indian reservation, a federal trust land. And that's simply not true, Your Honor, you heard testimony from Attorney White that there are public highways on reservations across this nation on reservations. In states — some just don't end at the reservation boarder, Your Honor. Defendant has argued a term called separate nation status. Your Honor, that is not a legal term of art, there's no definition of that, she cited no case law of that. The Indian reservations in this country are not treated as a foreign nation such as Canada or Mexico. It's special — very special legal status and they are —
THE COURT: But, they are a sovereign.
MS. STEERE: Domestic dependant nations.
THE COURT: They are more a municipality sovereign than they are more than —
MS. STEERE: Their sovereignty, Your Honor, depends on the very will of congress. I believe it was under the Eisenhower administration when they even had the termination acts when they were trying to terminate the tribes in terms of special legal status.
THE COURT: But, it's not the state of Connecticut telling them whether they are a sovereign or not.
MS. STEERE: Well, Your Honor, I'm saying is that it's a very different legal status. I'm not even sure what she's claiming when she says CT Page 15941-au separate nation status, because it's our legal term of art. Their domestic dependant nations are quasi sovereign and again, their very existence as far as legal status within the federal state system depends on the will of congress.
We've had administrations throughout our history that have tried to either — some administrations that have tried to enhance the rights of the tribes, some administrations that have tried to decimate the rights of the tribes. So, their very legal status is dependant on the will of congress. It is not treated separately such as Canada or Mexico.
THE COURT: There still is a U.S. Supreme Court.
MS. STEERE: Oh, the Supreme Court as well does not treat them as —
THE COURT: Well, as soon as the legislature goes to far they usually step in.
MS. STEERE: And they — as you can see there is many, many cases that the Supreme Court has handled where they have —
THE COURT: Because it's a federal law question. Okay.
MS. STEERE: That's correct. Furthermore, Your Honor, there is another avenue you can take in terms of your interpretation or your decision and that is Mohegan Sun Boulevard. You can look at it as an access road if you wanted to, the law will support you on this.
Under State versus Boucher (Phonetic), the terms open to the public in to which the public has access in accordance to an OUI statute are usually broad enough to cover parking lots, restaurants, shopping centers in other areas where the public is invited to enter and conduct business. Well, Your Honor, I'm sure that you seen by the numbers of dollars that the casino makes some profits every year they sure are in the business of conducting business and they do it well. So, it would certainly qualify as an access road, they want people to come to the casino and that's the main road, Mohegan Sun Boulevard, as an access road.
As far as the "onto" language that the Defendant refers to, because in the compact it says onto the public highways of the state of Connecticut. There is nothing in this language that precludes a road on the reservation for being a public highway. There is no case law or CT Page 15941-av statutes to support the Defendant's argument. And, again, sovereignty using the separate nation status doesn't end, it's not a —
THE COURT: But, the sovereignty again is dictated by the congress.
MS. STEERE: That's correct and they don't say that the state law ends —
THE COURT: And where does the congress say that it's a public road?
MS. STEERE: Your Honor, it's a series of analysis that you have to look at. Again, you look at the law; this question of a public highway would simply be a matter of state law and it's actually a question for the jury. It's a matter of fact.
THE COURT: You're contradicting yourself there. Okay. Go on.
MS. STEERE: Well, it's — this is the matter of the state and the tribe agreed it would be a public highway. If they didn't agree it would be a public highway —
THE COURT: They don't — read in their brief, they don't really agree to that.
MS. STEERE: Well, Your Honor the states —
THE COURT: They come up with some very limited explanation why they say it's a public highway. They don't want that known as a public highway.
MS. STEERE: Well, Your Honor —
THE COURT: And that's what their brief really says.
MS. STEERE: Your Honor, the state takes a different view from that and the Court may rule on that and they may not decide to make an issue on that, but the state takes a different view from the amicus and the tribe on that position. We have the documents from the State Traffic Commission.
Furthermore, Your Honor, the Defendant claims that our OUI statute is civil and regulatory, because we have this alcohol education. I guess the technical term is alcohol education system. First of all the fed raised this issue, the fed is not eligible for this program. Second of all, this program is not an automatic it's discretionary within the Court whether the court will even grant this program. This certainly wouldn't render it CT Page 15941-aw civil as you mentioned earlier that there can be mandatory sentences with a first time offender.
Your Honor, the Defendant also talks about the compact claiming that the compact doesn't give jurisdiction. Your Honor, the compact only emphasizes the jurisdiction the state already has. There's no question the state had it thought the Settlement Act and it emphasizes that we have jurisdiction not only on the reservation proper — and of course within the casino. But, it takes one step further and it says to the state — the tribe says to the state, we'd like to have a state trooper in our casino. How many private businesses say, we'd like to have a state trooper in our business. Well, that's what the tribe did here; they wanted that extra protection, not only for the reservation proper, but within the casino.
In fact, State versus Lake Spears ruled on that very question and said that it simply only emphasize the jurisdiction the state has, same language.
Your Honor, the Defendant makes an argument that the Settlement Act and first jurisdiction only by crimes and by or against Indians. Eight circuit and Thunder Hawk says that OUI is not a victimless crime. Operating under the influence is a crime against the tribe, it's a crime against society, it is not a victimless crime.
However, if you follow the Defendant's argument and they claim that this is a victimless crime it's not a crime against the tribe then the Defendant defeats their own argument, because then state law would apply to the non-Indian exception under the McBradney (Phonetic) trilogy of cases.
Your Honor, I briefly want to address some of the arguments that the Defendant has raised. Your Honor, the Defendant claims that the reservation — the Settlement Act is not a — the reservation not be treated as a public law of 280 state (Sic). But, Your Honor, it's not what congress says. Congress specifically said that the operation of jurisdiction on the reservation will operate in the same fashion as other states which exercise jurisdiction pursuant to public law 83-280. That's in the house report number 676 103rd congress, second session, page 8 and 9 1994.
Public law 280, Your Honor, can confer civil jurisdiction, it can confer criminal jurisdiction, it just depends on how the state and the tribe work things out. It doesn't have to be all, but it can be one or CT Page 15941-ax the other.
In conclusion, Your Honor, the facts, the law, both state and federal and tribal clearly show that the state has jurisdiction over operating under the influence offenses on the Mohegan reservation on Mohegan Sun Boulevard. And, Your Honor, as this has been brought up through the facts, this Defendant was seen operating in a parking lot of ten or more cars in the "K" lot and in the fueling station lot on the reservation as well. So, the issue of the public highway is another issue that is brought up, but he was also operating in those two areas in violation of the statute as well. Thank you, Your Honor, for your time.
THE COURT: Thank you. All right. One second now. So, we've been going for about an hour and 15. So, I'm going to take a quick break here, but I've got to get this in for the tribe. The tribe is in the business of gaming, isn't it?
MR. MCGUIGAN: Yes, it is, Your Honor.
THE COURT: I'll bet you a coffee that if you win their going to appeal, right? Probably.
MR. MCGUIGAN: I'm not a wagering —
THE COURT: You're not a wagering — well, let's say they do appeal, all right, how come — and I've said this months and months ago; how come the state of Connecticut, if I'm wrong or anything like that if I decide with you guys, you haven't done a codicil to say clearly that OUI is given to the state of Connecticut. I've been waiting for that.
 (WHEREUPON THE COURT TAKES A BRIEF RECESS) (COURT IS BACK IN SESSION)
MS. STEERE: Your Honor, may I just put my name on the record.
THE COURT: Pardon me.
MS. STEERE: I didn't put my name on the record for the clerk, may I just do that briefly?
THE COURT: Oh, okay, sure. CT Page 15941-ay
MS. STEERE: Assistant State's Attorney Sarah Steere. Thank you. Thank you, Your Honor.
MR. MCGUIGAN: Almost good afternoon, Your Honor. Austin McGuigan for the Mohegan Tribe Indians. With me is Attorney Dale T. White, he's sitting here; he's the General Counsel for the Mohegan Tribe.
Thank you, Your Honor, for the courtesy of allowing us to participate in the argument. There were a number of questions that were posed, one of which dealt with the closing of the road on the reservation, I don't know if that was answered.
As to whether or not there would have to be the road could be summarily closed and it would be our position that is the Mohegan Tribe's position, that that would require re-negotiation in order to close the road. There would have to be —
THE COURT: Under that agreement.
MR. MCGUIGAN: Under the agreement. And I think that the operative word here should be agreement. First of all, though, we have a federal statute, The Mohegan Nation Land Claim Settlement Act, 25-U.S.C.-1775, [25 U.S.C. § 1775]. This is October of 1994 and in it, it states that the consent of the United States is hereby given to the assumption of jurisdiction by the state of Connecticut over criminal offenses. The state shall have such jurisdiction to the same extent as the state has jurisdiction over such offenses committed elsewhere in the state. The first question then from our prospective is, what did congress mean when it extended this grant of jurisdiction?
THE COURT: Congress.
MR. MCGUIGAN: Significantly, significantly, two things are occurring. Congress has not retained for the federal government plenary criminal jurisdiction for this reservation; it did not retain it. The United States attorney for Connecticut has not asserted and at least on its face has not been given plenary criminal jurisdiction, which would allow the United States of America to enforce a statute similar to operating under the influence.
The important thing to realize is that cabazon has been decided in 1987 when congress passed this statute. Cabazon decided what was a criminal statute for purposes of Indian country. It made — in fact, the United States Supreme Court decided that. CT Page 15941-az
Judge Nieves (Phonetic) decided the very same thing in Connecticut inMashantucket Pequot Tribe versus McGuigan. There the Division of Criminal Justice through the state took the position that activities including violations of chapter seven, which deal with Single Prize Bingham (Sic) as well as I can show you 53-278B, [53-278b], which are our gaming statutes, gambling statutes and I can assure you that drunk driving was also considered the same. We took the position that all those statutes were subject to plenary state criminal jurisdiction. Judge Nieves limited the state to eliminating civil prohibitory statutes, precisely what the Supreme Court did in cabazon.
So, when congress passes this statute, congress has a given body of law, which defines, what a criminal offense is on a reservation for purposes of jurisdiction.
THE COURT: As interpreted by cabazon.
MR. MCGUIGAN: And it's already been interpreted — it's interpreted by the United States Supreme Court and in Connecticut has already been interpreted by Judge Nieves. So, that the statute, and I would say this, although, perhaps foolishly, no one could reasonably argue that from congresses standpoint when it passed the last Settlement Act that they weren't attempting to confer jurisdiction over OUI and similar offenses. Simply, because those types of offenses under the cabazon analysis —
THE COURT: That's what the tribe thought?
MR. MCGUIGAN: That's what congress —
MR. MCGUIGAN: State's already said that's what they thought.
MR. MCGUIGAN: But, that's what congress did.
THE COURT: And the congress attempted —
MR. MCGUIGAN: Congress —
THE COURT: — no one's questioned that. (Sic)
MR. MCGUIGAN: Well, congress passed it, so at least from our position they did it. The grant is clear. Now, the second question arises, is there anything in the compact, the agreement with the state, which limits the plenary complete cabazon grant. CT Page 15941-ba
In other words, did the contract between the parties, as Your Honor, mentioned, did the contract between the parties, that is the state of Connecticut and Wiggins accept less than congress granted. Was there some intent of the parties in the compact to limit what they were taking, because the grant appears clear on a cabazon.
The tribe in a May 1994 agreement consent the criminal jurisdiction over Mohegan Tribal Members and all Indians on tribal lands. Such criminal jurisdiction shall extend to the criminal laws to the same extent as the criminal law jurisdiction in criminal court and jurisdiction, which empower the state to respect to any other person or lands or other natural —
THE COURT: What about what the state — now you're saying they gave it to the state, but then the state is saying that it isn't criminal.
MR. MCGUIGAN: The state — no. The state is using the term criminal laws — the state and the tribe are using criminal laws and criminal jurisdiction. The state's position has been that criminal jurisdiction includes OUI offenses. The state has never — in fact, the state of Connecticut's position is as — which started theMashantucket versus McGuigan case; the state of Connecticut's position is more expansive than that. The state took the position that they had criminal jurisdiction over civil prohibitory statutes. The Court said you're limited —
THE COURT: But, you lost that.
MR. MCGUIGAN: Excuse me, Your Honor.
THE COURT: You lost that aspect of it with Judge Nieves.
MR. MCGUIGAN: We lost, but the only portion we lost is no question that Judge Nieves would not rule — that would rule that —
MS. CARR: Excuse me. Your Honor, I have to object. Mr. McGuigan is testifying. If he wants to take the evidence that was presented during these hearings over the past year and present them as they are now that's fine. But, if he's going to testify as —
THE COURT: No, he's taking the position what were cases (Sic). The mere fact that he was the Chief States Attorney — you know. But, at the CT Page 15941-bb same time I very much doubt, Mr. McGuigan, it was back then it was probably Masamino (Phonetic) or Schulman.
MS. CARR: He's testifying as to the intent of the statute when it's not in the statute itself, Your Honor. And I just wanted to note an objection to him testifying at this late time.
THE COURT: Okay.
MS. CARR: If he wanted to testify he had a year to get on the stand, Your Honor.
THE COURT: Your objection is noted. Your objection is noted. Okay, Mr. McGuigan.
MR. MCGUIGAN: The state of Connecticut in the compact shall have jurisdiction to enforce all criminal laws of the state. There is nothing in the legislative history that would indicate that the state of Connecticut did not intent — did not intend and did not try to limit the grant that have been given by congress.
So, that what we're saying is that the provisions, the intent of these provision was clear; people intended — it's clear, it's clear, because the case law had already defined the terms. The case law had defined —
THE COURT: Cabazon predated. Okay.
MR. MCGUIGAN: And Judge Nieves. It's interesting to know while someone's trying to argue that I'm arguing to be testifying. It's interesting to know that the state when it — in order to have a case in Mashantucket versus McGuigan, took a position, it's in the case you can read it. It's the position is that bingo is forbidden under Connecticut state law as a criminal statute for purposes of enforcement and that Judge Nieves ruled that it was civil regulatory and therefore not considered criminal; and the state did not appeal that ruling. So, that the state did not take that case to the United States Supreme Court.
The Supreme Court ruling came down affirming it and the state accepted the ruling, didn't appeal it and had a ruling — and had a clear defined parameters of what the jurisdiction of this state was and what it was not; and the parameters were clear. CT Page 15941-bc
THE COURT: And McGuigan applies the cabazon test.
MR. MCGUIGAN: The cabazon test, which was essentially the Neves test, cabazon being totally controlling as the United States Supreme Court. But, the state did not dispute the Judge Nieves's analysis.
Therefore when the gaming compact was being adopted they were not writing on a clean —
MS. CARR: Your Honor, objection. He's testifying. I can't — he's testifying as to what it was like to draft the agreement and draft the compact.
THE COURT: He's arguing cases that are a matter of record that are in everybody's briefs.
MS. CARR: Your Honor, when he was arguing that the language —
THE COURT: All right. I —
MS. CARR: — of State versus McGuigan, that was one thing.
THE COURT: Your objection is noted. I have the ability to know what the cases stands for and whether he's adding personal interjection, which is almost impossible to avoid.
MS. CARR: Your Honor, I'm going to just say if for the record if I may. Mr. McGuigan had plenty of time; the Mohegan's have been involved in this case for several months, they were involved in the case when testimony was being taken in and evidence was being presented. At that time, you even stated that you may have Mr. McGuigan take the stand —
THE COURT: Um-hum.
MS. CARR: — and you decided against it. Mr. McGuigan didn't want to testify. I believe Mr. White didn't want Mr. McGuigan to testify. There was some discussion regarding —
THE COURT: Okay.
MS. CARR: — the possibility of him testifying. I'm going to object and I'm going to ask that this portion of his argument be CT Page 15941-bd strickened.
THE COURT: Your objection is noted. Mr. McGuigan as long as he's arguing the actual case law I'm not going to have a problem. If he gets into personal —
MS. CARR: But, he's not.
THE COURT: — interjection and everything I'll stop him and for that matter I can cut through the chase too.
MS. CARR: He's —
THE COURT: I've been dealing with Mr. McGuigan a lot longer than you have, so don't worry, I have the ability to see what he's doing.
MS. CARR: But, he's arguing from someone that argued the case and someone that drafted the briefs and someone that — or he's arguing from someone that possibly helped draft the documents and he had his opportunity to testify and decided not to.
THE COURT: You have that on the record. Okay, Mr. McGuigan.
MS. CARR: That should be strickened, Your Honor.
THE COURT: Okay.
MR. MCGUIGAN: Again, Your Honor, when the gaming compact was being adopted between the state and the tribe, they were not writing on a clean slate. They already had a Supreme Court ruling, they already had a Federal District Court ruling, they already had the Land Settlement Act passed with a clear understanding, so the only question then, can one conclude that somehow the tribe or the state was attempting —
THE COURT: What's the date of Brown, I don't have that in front of me right now. That, I think, was existing at the same time. But, I just —
MS. STEERE: 1990, Your Honor.
THE COURT: 1990?
MS. STEERE: Yes. CT Page 15941-be
THE COURT: Okay. All right. Go on, Mr. McGuigan.
MR. MCGUIGAN: So, there can be no question that they intended to have jurisdiction. The federal government has not reserved it, congress did not reserve it for the federal government, that is jurisdiction over offenses similar to OUI, they haven't reserved it.
The grant was clear, because federal law controls when congress is speaking and they had a clear definition. That's what they gave the state of Connecticut. And now the only question is, did someone in the state of Connecticut try to accept less than what they were granted. And the answer to that is, there is nothing.
Given the case law that would lead one to conclude based on anything in the record that I can see that either of the parties — clearly the tribe has already made it plain that they intended it to be that this grant was to cover OUI and clearly the question —
THE COURT: And they acted in accordance.
MR. MCGUIGAN: And they acted in accordance.
THE COURT: From the very onset of the reservations existence, OUI cases have been prosecuted by the state and the tribe has never taken a contrary position. If there is anything more clearer what they thought they had done or intended, that's it.
MR. MCGUIGAN: And I see nothing in the record that —
THE COURT: So, no personal statements by him or even Mr. White. It's how they conducted themselves, everybody thought they had an agreement here.
MR. MCGUIGAN: And that is my argument, Your Honor. They thought they had an agreement, the state of Connecticut proceeded as if it had an agreement, okay? There was nothing in the record that was suggested the state did not intend that. And the statute 53A-24, [53a-24], just simply does not avail.
The rules of criminal procedure apply to OUI cases. Both the practice book and the statute cover — no one would suggest that the conviction of OUI doesn't require criminal prosecution standards. It is not a civil regulatory statute, it requires criminal prosecution CT Page 15941-bf standards, it is covered in the —
THE COURT: It has complimentary civil standards though.
MR. MCGUIGAN: It's covered in the practice book under criminal procedure, it is covered for all purposes as a crime, it is deemed to be a crime. So, the question is, can something be different than a crime, did the parties intend that this was not going to be a crime in a compact? Because, the only way I see a conclusion that there is no jurisdiction is to reach the conclusion that the parties intended to limit congresses grant. And I simply see no evidence that it occurred.
THE COURT: That's it?
MR. MCGUIGAN: I believe the state has covered the public highway and parking area and access road more than adequate.
THE COURT: Okay.
MR. MCGUIGAN: Thank you, Your Honor.
THE COURT: All right. Okay. Thank you very much.
MR. BEEBE: Your Honor, can I borrow your volume seven, section seven for a moment?
THE COURT: Volume seven? 21A, 20 and 21A?
MR. BEEBE: No. Section seven.
THE COURT: Section seven what?
MR. BEEBE: of the statute.
MS. CARR: Here.
THE COURT: Titled volume two. All right. Is that it? (NO RESPONSE) All right. I'm ready to rule. I've been reading briefs and this forever and everything else. All right. We're here very simply for one reason and that is basically Brown, Trahan, and in subsequent maybe ambiguity on the history or that — what?
MS. CARR: Your Honor, I had some rebuttal comments.
THE COURT: Oh, as I said, "is that it?" and no one said anything. CT Page 15941-bg
MS. CARR: Oh, no, I'm sorry, I didn't hear that part of it, Your Honor, I was looking over my notes.
THE COURT: Okay. All right.
MS. CARR: First of all I just looked over Mashantucket versusMcGuigan, and it's Mr. McGuigan's position that they did this with cabazon in mind. However, cabazon is not quoted in Mashantucket versusMcGuigan. I just looked through it, I didn't see it.
THE COURT: All right. That's not the point of the argument, it doesn't matter.
MS. CARR: Well, if a Court took this —
THE COURT: It was in existence, that was the main point.
MS. CARR: If the Court took it into consideration then it should have been cited in the case.
THE COURT: McGuigan was in existence then.
MR. MCGUIGAN: One case in `86, one is in `87. I'm not sure what she's trying to say. The cases stand for the same proposition. One is a state case and it was the state's position in that case that bingo was covered. That is a different position in California and cabazon, but it's the same principle. The Supreme Court affirmed it and that became ultimately controlling.
THE COURT: Okay. And that's what I'm interested in.
MS. CARR: But, Your Honor, my — the premises —
THE COURT: Okay, fine.
MS. CARR: — has been set forth that Mashantucket versus McGuigan
was decided with cabazon in mind. And then these documents were drafted with cabazon in mind. I don't see that and I looked for it. The state and the Mohegan's have claimed that this is very clear, this is very simple, that this is very obvious, that everybody intended 14 —
THE COURT: Did they have Brown in mind? Your argument goes both ways. CT Page 15941-bh
MS. CARR: Yes, Your Honor.
THE COURT: Okay.
MS. CARR: Everybody has said that it's very clear that 14-227A, [14-227a], is criminal and that 14-227A, [14-227a], was considered when all of these documents were drafted and that it's very clear to all of us. And if it's very clear, Your Honor, why after one year are we still here on evidence and argument?
THE COURT: That's your guy's fault that has nothing to do with me.
(ALL LAUGHING)
MS. CARR: You, yourself stated that there is a missing section to the Settlement Act and that missing section leaves out statute — Connecticut general statute section 14-227A, [14-227a], and similar statutes that are civil and regulatory in nature that are not covered under the criminal statutes and that are not considered criminal in nature.
State versus Trahan is clear. State versus Brown is clear and they hadState versus Brown.
THE COURT: Brown started it all.
MS. CARR: State versus Trahan looked at the DUI statute under a 53A-22, [53a-22], analysis. And under 52A-24, [52a-24], decided that14-227A, [14-227a], was not criminal in nature. I think that this Court is bound by that, I invite you to re-read the briefs if you'd like, but I think that this is a state court, it's a state prosecution and we're bound by state law here.
The state — Connecticut Supreme Court did not use cabazon and did not use the cabazon test in determining Mashantucket versus McGuigan, and therefore neither should you. It's a federal test, this is not a federal case, it's a state court case.
THE COURT: Okay.
And I would just like to respond to some of the arguments that were brought up. CT Page 15941-bi
THE COURT: Okay.
MS. CARR: As I said, everybody says it's clear, however, I don't think it's very clear.
THE COURT: Some of it isn't.
MS. CARR: I'm sorry.
THE COURT: Go on.
MS. CARR: They talk about the fact that congress put traffic control jurisdiction over to the state. Within the compact and the agreement and other documents that we've read, they define traffic control as 14-297 at sec, which has nothing to do with 14-227. It has to do with street signs and traffic lights and intersections and things like that.
THE COURT: I agree with you —
MS. CARR: It doesn't have to do with —
THE COURT: — on that particular thing.
MS. CARR: — 14-227A, [14-227a], so I think that that argument on behalf of the state does not work. The state made the argument that if the state wanted to use its own interpretation of what is criminal and what is not and put the cabazon test aside, that any state could squash down the sovereignty of Indian reservations down. So, that if, you know, the state wanted to say playing tiddly winks is against the law and it's criminal in nature, then they could. That isn't necessarily true. If you look at cabazon, cabazon looked at gambling and fireworks; those were allowed in other parts of the state.
THE COURT: Maybe somebody thinks tiddly winks is as dangerous as fireworks, how do I know.
MS. CARR: But, those things were allowed in certain measures in other parts of the state. The state runs a lottery, the state allowed church bingo, so why not — therefore, it couldn't be regulated on the reservation, because it's allowed other places. There are places — so, I don't think that unless they were going to create it — make it a crime all over the state then that argument that states could change things to squash down the sovereignty of the Indians wouldn't work. CT Page 15941-bj
Also, I think that if you say that DUI is noncriminal throughout the state except on the reservation where it is criminal then you're doing just that. And I think you have to follow State versus Trahan.
THE COURT: What did you say?
MS. CARR: I'm saying, if the state's argument is that we can change any law we want into criminal so that we can enforce it on —
THE COURT: I thought you were arguing the exact point they were doing there for a second, I thought.
MS. CARR: No. I think the result would be the same.
THE COURT: Okay.
MS. CARR: I don't think that you can say then in the City of Norwich DUI is not criminal under State versus Trahan, but when you go on the reservation it automatically becomes criminal.
THE COURT: Okay. I see your point now. Okay. If it isn't Klutz and all the other ones in the subsequent cases trying to distinguish the original Brown decision and their trying to limit it. They started off with the original premise, "Oh, yeah, Brown is right." But, then they get around it.
MS. CARR: But, State versus Trahan didn't. they said that DUI is non-criminal in nature.
THE COURT: What was probation?
MS. CARR: I'm sorry.
THE COURT: What was the underlying premise, but for the purposes of violation of probation, no, or AR. They got around it.
MS. CARR: They talked about the standard of the point 1-0 under14-227A, [14-227a]. We do recognize that there is a common law OUI, however, even under the common law OUI it allows behavior at certain levels — it allows behavior in some instances where it does not — regulates how much of the behavior you took part in. CT Page 15941-bk
THE COURT: Drinking while driving as opposed to drunk driving. Okay. All right.
MS. CARR: It may allow it a little bit as long as you don't get to a certain point. However —
THE COURT: Okay.
MS. CARR: We also discussed the consent of the Indians to 14-227
— no. 14-297 at sec, specifically 14-310, you were talking about the construction of lanes. However, that has to do with the construction and again 14-297 at sec, not 14-227, which we are dealing with here. I just don't want the Court to be muddled in the different — well, no, I don't think you're muddled, Your Honor. I think you are very clear.
As to the issue of public roadway, the state stated that —
THE COURT: You win that one.
MS. CARR: I'm sorry.
THE COURT: You win that one.
MS. CARR: Oh, thank you, Your Honor. The same should be true as the parking lot then, Your Honor.
THE COURT: You win that one.
MS. CARR: Thank you. And you pointed out yourself, Your Honor, that obviously if we've gone through all this there is a problem between the agreement, the compact, the statute and that they've had an opportunity to change it; they can change it, they can fix it this afternoon. They can sit down and agree with the state that 14-227A, [14-227a] —
THE COURT: That's true of anything though.
MS. CARR: — and all regulations can be fixed, but they can't fix it to my client; and you may say that they meant —
THE COURT: I'm just looking at that in that respect. I made a rather infamous OUI decision and people stood around and crucified me for six months when they should have corrected it. CT Page 15941-bl
MS. CARR: Well, they can correct it —
THE COURT: But, I'm just saying in this situation I hope it doesn't happen again, because you might be able to tie this up, this issue up for a year, year and a half, two years.
MS. CARR: But, they can fix it tomorrow. And you may say —
THE COURT: I think they can.
MS. CARR: — that they meant this and —
THE COURT: With the consent of the governor or whatever.
MS. CARR: They may say that they meant this or they intended this or whatever —
THE COURT: Oh, I don't think they can fight you on that.
MS. CARR: — they wanted. However, the average person walking down the street, I don't think would know that. And the average person driving on the Mohegan Indian reservation wouldn't know what they meant in all of this paperwork. It's taken us a year to figure out what we think they meant.
So, I don't think the average person walking down the street has notice of what is allowed and what is not allowed on the reservation, what's enforceable, what's not enforceable. I mean maybe it's an issue for the appeal, but it's an issue nonetheless.
THE COURT: (Indiscernible) laws have never been a defense.
MS. CARR: I think that the state has indicated that we have no state law to show that this is not enforceable on the reservation. However, they have no case law to show that 14-227A, [14-227a], is a criminal statute. They have cases from the Midwest that say under Minnesota law it's criminal, under Idaho law it's criminal, under California law it's criminal. However, under Connecticut law, Your Honor, it's not criminal.
And the state also stated that the compact merely emphasizes the jurisdiction — actually, I think Mr. McGuigan stated the compact merely emphasizes the jurisdiction that the state already has. However, again, I think we're in one of those gaps that was discussed in the CT Page 15941-bm Mohegan's exhibit A to their amicus brief that we've hit a gap in —
THE COURT: I still don't know what that is —
MS. CARR: — coverage.
THE COURT: — but, all right.
MS. CARR: Mr. McGuigan argued many things, but he argued that the Settlement Act is similar to public law 280. If that's the case then civil things would be — or exactly like public law 280 and we go by that. Then obviously, the Mohegan's are trying to give up their civil jurisdiction as well and torts and things like that, that lye on the reservation would obviously come under state jurisdiction as well.
THE COURT: Let's go off record for a second while they are talking.
 (Off record) * * * (Back on the record)
MS. CARR: And lastly, as to the argument of the fact that there may be jail time associated with 14-227A, [14-227a], dependant upon the Defendant's status. My client may come in as a first offender and if he does he's looking at —
THE COURT: I have to read the statute entirely.
MS. CARR: He's looking at 100 hours of community service, Your Honor.
THE COURT: But, I'm looking at the statute in the entirety of 14-227A, [14-227a].
MS. CARR: Okay. However, the argument that they use under cabazon they looked at 7-169, the bingo statute, under — bear with me, Your Honor; 7-169 subsection five it states, any person who promotes or operates in a bingo game without a permit or who violates any provision of this section or section 7-169-8 or administrative regulations issued pursuant thereto or who makes any false statement or in any application for a permit or in any report required by this section or by the executive director shall be fined not more than $200 or imprisoned not CT Page 15941-bn more than 60 days or both.
So, even though there is potential mandatory — potential jail time associated with the bingo statute, the Connecticut Supreme Court stated that it was regulatory in nature and did not carry with it — it was not criminal in nature.
THE COURT: Um-hum.
MS. CARR: Therefore, I think the same can be said for 14-227A, [14-227a]. I think that Your Honor is bound by state case law and under State versusTrahan, Brown, Klutz, 14-227A, [14-227a], is non-criminal in nature, Your Honor.
THE COURT: Thank you.
MS. CARR: Thank you.
THE COURT: Let's —
MS. STEERE: Just a very brief response, Your Honor.
THE COURT: Just a real quick response.
MS. STEERE: Your Honor, just very briefly, in a nutshell the state does not maintain the jurisdiction over operating under the influence on the reservation is granted by the state Traffic Commission section.
Our argument with respect to state Traffic Commissions rule and reservations that the tribe by the compact agree to meet the standards set by the state Traffic Commission and therefore the STC required the Mohegan Sun Boulevard be maintained as a public road and the fact that the Mohegan Sun Boulevard is a public road —
THE COURT: I understood your — I understood that argument you made.
MS. STEERE: It relates to the fact of termination (Sic).
THE COURT: And I read the stuff and everything, but it was more — it was not to make it a public highway it was to make it that they just gave you a limited thing in the language that I read.
MS. STEERE: In between the two parties that they then subsequently CT Page 15941-bo agreed to do that, which is what we're saying. But as an agreement between the state and the tribe, certainly not a grant of jurisdiction for OUI under that section, we have not argued that.
You asked an interesting question, Your Honor, before we broke before the recess and that is why doesn't the state have a codicil to the compact. Interesting, the compact can't alter jurisdiction arrangements as they already exist and that's pursuant to the Indian gaming regulation. They can refine, but they can't —
THE COURT: I thought I read somewhere way back in my reading of the stuff you provided me, they have the right to amend and everything, don't they?
MS. STEERE: They can amend, but if there is a grant of jurisdiction — in other words, the state's arguing that the state has full criminal jurisdiction on the reservation. The Indian gaming regulatory says to the tribes and to the state, you can't narrow that. You can't take jurisdiction away that congress already granted; only the congress can do that. They might be able to add that, but they can't take it away, they can't limit that.
And so, another reason why that is something that wouldn't be covered in the compact, Your Honor, is that the state and congress and the tribe already thought that was covered. OUI was already granted in that first grant of jurisdiction.
THE COURT: I don't doubt that for a second.
MS. STEERE: And also, Your Honor, another reason why there is a broad grant of jurisdiction and why there is a cabazon analysis that is used and that analysis, criminal prohibitory, civil regulatory has been used in many cases as part of cabazon including McGuigan, including Butterworth in Florida, a number of cases in which the Supreme Court adopted; is that it would put the state and the tribe in a very difficult position of every time the state legislature enacted a law or amended a law, then you would have to go and rewrite the — you would have to rewrite the Settlement Act. And that's why there is a broad grant of jurisdiction to cover that. And if the state —
THE COURT: Like I said, in your arguments you use more common sense than you did — you use law all throughout your briefs, which sometimes is harder to understand. CT Page 15941-bp
MS. STEERE: And, so, Your Honor, that's why we have that broad grant of jurisdiction. It's a working document like the constitution, it evolves as situations arise and we would have to go back to congress itself to handle that.
And as to the public highway issue, I think the argument the defense are making is too narrow of an argument as to what constitutes a public highway. There's no question that the reservations also a public law 280 state; congress said it was to be treated as such. And under public law 280 states can have criminal jurisdiction, civil jurisdiction, or both. And under public law 280 states can also limit the amount of jurisdiction that they assume and they can decide to take it over certain offenses.
Interesting, if you look at our grant of jurisdiction we decided to take it over all and the tribe agreed with that, all offenses.
Furthermore, Your Honor, the state argues that the tribe — that the Mohegan Sun Boulevard can certainly be considered an access road in which case the OUI statute would clearly apply on the reservation.
And as for the sentencing factors whether someone is to receive a jail sentence; that is one factor that cabazon looks at. What they really look at is what the statute —
THE COURT: The intent, they ought to read the whole statute, look at the whole deal, everything.
MS. STEERE: Right. And there is no question that the state of Connecticut wants to prohibit drunk driving or operating under the influence of intoxicating liquor and/or drugs in the state of Connecticut. Thank you, Your Honor.
THE COURT: Mr. McGuigan.
MR. MCGUIGAN: I'll be very brief, Your Honor. I just — I'm trying to frame this argument for purposes of understanding what — how a codicil could remedy it.
THE COURT: That's just an aside by me (Sic). I had thought that that was possible. Now, I'm not so sure.
MR. MCGUIGAN: It's been suggested that congress somehow didn't grant full criminal jurisdiction within the meaning of cabazon to the state and CT Page 15941-bq the Mohegan nation land claims Settlement Act. If that's true, which I see no basis for reaching that conclusion, they already had definition for all the words and they used them.
THE COURT: Um-hum.
MR. MCGUIGAN: But, in any event if it were true it would have to go back to congress and say, you forgot something. Interestingly —
THE COURT: Well, they didn't think they forgot. I'm agreeing with you on that argument too. It's just something to make clear that the parties agree that OUI is criminal for the purposes of this act, that's all I meant.
MR. MCGUIGAN: And that's the point. For purposes of the Settlement Act and for purposes of the compact, operating under the influence was intended to be and is criminal. It is criminal under the federal definition, it is criminal prohibitory and bringing up Judge Nieves's — someone quoted as a Connecticut Supreme Court, that's a Federal District Court decision in McGuigan. It is not — it preceded the year before, it uses the same reasoning.
The reason why he doesn't decide that bingo is a criminal statute as Assistant State's Attorney has pointed out, is because it's not uniformly prescribed; it's permitted at some times, therefore, even though he — that is the graven of the rule.
THE COURT: Thanks, I appreciate —
MR. MCGUIGAN: That — the graven of this ruling should be I suggest precisely the opposite.
THE COURT: Okay. All right. I'm done. Okay. At first of f, Mr. Brodeur, I want you to know that when lawyer's stress me with all their arguments and what not I handle it with humor, so don't take that I haven't taken your case very seriously. I've put more time into this, read more briefs and everything else than I have, except for maybe one other case in my career, okay? And I've listened to everyone here and I've read all these briefs. I've taken this very seriously.
And again, I've already complimented the defense and I've complimented both the state and the tribe. Everyone's done a real good job here. It's always nice at my age to learn something new and be educated and I've appreciated it. CT Page 15941-br
Basically, I know why I'm here, I'm here because of Brown and Trahan, that's why I'm here. Brown and Trahan and what, if any, effect does it have on OUI on the boulevard or in the parking lot. Okay. I start with this overriding premise, because it affects the rulings in several different areas. I'm going to rule the Court's feeling on almost everything. The only one that I'm going to touch on that much is the public highway, because I thought it was — there was area I feel very confident that I'm right; very confident. All right.
First, the tribe and the state of Connecticut clearly, absolutely not if and buts about it, intended OUI to be a part of this agreement. There's things in the history that they thought they were doing in reference to public safety, whether it was section seven or section three, it's replete with what they were attempting to do on the reservation; it's in the history, it's in their intent, it's in their conduct of how they've conducted themselves ever since.
As far as they were concerned but for Brown, Trahan and everything, they thought — and you can throw in you cabazon and McGuigan was in existence; they had every reason to believe that OUI was going to be under the compact, under the — whether it was the way the congress granted it to them, whether they wrote it to themselves, they intended OUI to be covered and that's what I find. Then you have your argument — I'll address your argument on Brown, Trahan, Klutz, all of them.
Even under that argument I rule against the defense, because as I read those decisions it says in accordance with 53A-24, [53a-24], and then subsequence to decisions to a semi — sort of a cabazon test to decide whether they are going to apply to different situations such as AR and AR and AP violation or whatever the case might be. You throw in the contractual language here that is encompassing the settlement and everything else.
I think our Supreme Court or appellate court will quite clearly distinguish just as other cases as distinguished for the purposes of interpreting whether OUI on the reservation is covered, they are going to say, "No". I mean they are going to say, yes, it is covered, they are going to say that was the intent and that's the language of even Trahan, your strongest case, where they say, well, this is for this reason.
Well, clearly I think they were distinguished and say OUI was meant even under your interpretation of those cases. But, the area I think I'm the most sure of is this is a federal law question, this is a federal law CT Page 15941-bs question and it's decided by federal law, it's decided by cabazon, McGuigan and all the other cases I had to hear (Sic) and all the analysis, the shorthand test, the intent, the history and everything and to me if it looks like a duck, if it smells like a duck, if it talks like a duck, it's a duck; and clearly this is a criminal law for all other purposes other than the state of Connecticut's interpretation under Brown, Trahan and everything else. That's the most limited purpose there is.
This is a criminal violation; there is mandatory minimums, there is sentencing, there's probation. Everything about it is criminal but for those decisions. And again, now that the federal law is even clearer they've already decided similar issues, they've already — those cases cited by the state they've decided it.
Under any analysis I look at this as a criminal violation under the federal law. What am I missing? The public highway — I definitely think that the grant under the STC grant does not make it a public highway.
Some of your arguments, other arguments, the states arguments might have merit. But, for now I'm going with — unless it's specifically granted or stated, which goes with your arguments in other areas and even your arguments; unless it was specifically said it's a public highway their a sovereign — whatever kind of sovereign you want they're not a municipality they are a different sovereign, their govern by federal law, it's not a public highway. I think I've covered almost all of the arguments.
MS. STEERE: The parking lot, Your Honor, and access.
THE COURT: Parking lot —
MS. STEERE: Access road.
THE COURT: — same thought — same analysis. Same analysis. I do not see a mall parking lot or a package store parking lot or anything — this is a sovereign nation with its own sovereignty within the confines of you know, I just don't see that.
And I know hardly anybody addressed that issue from that point — that particular point of view, but I never saw anything say differently that at their grant makes them what they are; I've read what the grant is, that does not make that fit the statute of 14A-227A, [14a-227a]. Anything else? And what I will do on this is I will have a transcript CT Page 15941-bt ordered and I will sign off and it will settle as a memorandum of decision. I've just — I put the time in on this, I just don't think with the trial that I have right now that I'll be able to get to this —
MS. CARR: Excuse me, Your Honor.
THE COURT: What.
MS. CARR: We had put into a motion to dismiss and I heard your opinion on the arguments, but what is —
THE COURT: Motion to dismiss is denied.
MS. CARR: How could it? Do you mind if I ask for an explanation on the parking lot issue, Your Honor?
THE COURT: The parking lot issue?
MS. CARR: I mean on the —
THE COURT: You won on the parking lot issue.
MS. CARR: Yes. So, the statute reads public highway of the state.
THE COURT: You won on that too.
MS. CARR: I'm sorry.
THE COURT: You won on that too, on those two areas. It's the other areas of whether it's a criminal violation. In some ways I think that's even what the tribe really meant to argue too. Anything else, an articulation, what? Does everybody understand where I'm at?
MS. CARR: Your Honor, I don't understand something.
THE COURT: What.
MS. CARR: If it's not a public highway of the state and it doesn't fit within the statute then the motion to dismiss should be granted.
THE COURT: What?
MS. CARR: I said, if it's not a public highway of the state — CT Page 15941-bu
THE COURT: What? It's their granted jurisdiction (Sic). On that particular limited argument the way it was presented I don't rule with you (Sic). The jurisdiction was granted, the jurisdiction was granted through the compact, it's criminal, everything about it. That's the way it was granted.
They have jurisdiction there. They have the jurisdiction for it and the public — that's the way it becomes a public highway by the grant; that they have jurisdiction on the reservation. All right. The argument that was made in the briefs I did not buy in the sense of STC and all that stuff. That's all.
MS. STEERE: Thank you, Your Honor.
THE COURT: Okay. You can put all of this stuff in your file, because I am done with it.
THE MARSHAL: Your Honor, are we in recess?
THE COURT: Yes.
THE MARSHAL: Court's in recess.
 (WHEREUPON THE COURT TOOK A RECESS) * * * (BACK ON THE RECORD)
THE COURT: You guys got confused about what I was saying. Okay. I did not rule on the public highway or parking lot aspect of it, I ruled on the other aspect that it is — that they get — I've already stated all of this.
MS. CARR: So, Your Honor —
THE COURT: Yes.
MS. CARR: — where part of our argument was that it's not a public highway of the state under the —
THE COURT: It is — CT Page 15941-bv
MS. CARR: — statute, you're not ruling on that.
THE COURT: It is a — for the purpose of the OUI, yes, it is. But, as for the STC and all of that other nonsense that isn't what I bought. That's all I'm saying. I can see how it was confusing.
 * * *
Kevin P. McMahon